AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Middle District of Florida

| | |
|---|---|
| United States of America<br>v.<br><br>DAVID ALLEN BOILEAU<br><br>*Defendant(s)* | )<br>)  Case No. 8:19-MJ-1523-T-AAS<br>)<br>)<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __January 21, 2019__ in the county of __Pasco__ in the __Middle__ District of __District__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 42 U.S.C. § 3631 | Criminal interference with right to fair housing. |
| 18 U.S.C. § 1512(a)(2)(C) | Tampering with a witness, victim, or informant by physical force or threat communication. |

This criminal complaint is based on these facts:
See attached Affidavit

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Susana Mapu, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: April 19, 2019

_____
*Judge's signature*

City and state: Tampa, Florida

Amanda A. Sansone, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Susana Mapu, Special Agent with the Federal Bureau of Investigation (FBI), declare under penalty of perjury that the following is true and correct to the best of my knowledge:

1. I am a Special Agent with the FBI and have been so employed since 2004. I am currently assigned to the Tampa Field Office, White Collar Crime Squad, where I investigate Civil Rights violations among other violations of federal criminal statutes.

2. I submit this affidavit in support of a criminal complaint. For the reasons that follow, there is probable cause to believe that DAVID ALLEN BOILEAU interfered with a person's housing rights because of her religion and national origin, in violation of 42 U.S.C. § 3631 (Criminal Interference with Right to Fair Housing). There is also probable cause to believe that BOILEAU tampered with a witness, namely, L.C., by threatening to kill him, in violation of 18 U.S.C. § 1512(a)(2)(C) (Tampering With a Witness, Victim, or Informant by Physical Force or Threat Communication).

3. The facts set forth herein are based on my personal knowledge, my review of documents and records related to this investigation, my communications with others who have personal knowledge of the events and circumstances described herein, and knowledge gained through my training and experience.

## PROBABLE CAUSE

4. On or about January 21, 2019, at approximately 6:30 p.m., in response to a reported disturbance, Pasco County Sheriff's Office (PCSO) deputies arrived at an address on Pinehurst Drive, Holiday, Florida, 34691, which is in the Middle District of Florida. Upon arrival, deputies encountered L.C., who stated that he was standing in his driveway when he observed DAVID ALLEN BOILEAU—who lives a few houses down from him—walking on the roadway in front of L.C.'s residence. BOILEAU asked L.C. if he knew his neighbors, who also lived on Pinehurst Drive across from L.C. and a few houses down from BOILEAU. L.C. replied that he knew all of his neighbors and was immediately suspicious of BOILEAU. L.C. asked BOILEAU why he wanted to know who the neighbors were. BOILEAU stated something along the lines of: "these people who live here are an eyesore to this country, and I am here to protect it against people like that…Fuckin' Iraqis, I am going to clean up America!...they don't belong here." BOILEAU appeared to be referring to an individual and her family, persons originally from Iraq who practice the Muslim faith and live directly across the street from L.C. (hereinafter the "victim" and "victims"). BOILEAU then reached into his pocket, told L.C., "you didn't see anything," and threw what appeared to be nails or screws onto a car parked on the victim's property.

5. The victim is a widowed single mother with four minor children. The victim and her children immigrated to the United States from Iraq in or around 2015

2

through a refugee visa, after purchasing her Pinehurst Drive home with her extended family in approximately 2014. The victim was a legal permanent resident and is now a United States citizen. The victim and her family practice the Muslim faith and are originally from Iraq.

6. Both BOILEAU and the victim live in houses on Pinehurst Drive. Although their houses are separated by a few homes, the victim's house and BOILEAU's house sit diagonally from each other with a direct line-of-sight between their respective properties.

7. L.C. contacted PCSO and reported that he confronted BOILEAU and asked him to pick up every nail or screw that he threw. BOILEAU responded, "fuck you it is up in her yard and it won't get your tires." After uttering profanities at L.C., BOILEAU walked away. The victim was not home at the time of this incident.

8. PCSO deputies took L.C.'s statement and collected the metal screws that BOILEAU had thrown. The car in the victim's driveway did not appear to be damaged. PSCO deputies went to BOILEAU'S house to speak to him but were unable to find him. PCSO deputies spoke to the victim, who arrived home shortly after BOILEAU had left, and provided her with information on how to file a non-contact-protective order against BOILEAU. The victim subsequently petitioned for such an order and a judge granted her request on or about February 8, 2019. [Victim] v. David A. Boileau, Case No. 2019DR000417DRAXWS. The order directs that BOILEAU cannot not be within 250 feet of the victim.

10. The next afternoon, on or about January 22, 2019, L.C. saw BOILEAU standing on a pile of wood and peering over a fence looking toward the victim's house. BOILEAU then attempted to "go over" the fence, but could not. After attempting to scale the fence, BOILEAU came around to the victim's front yard and opened the victim's mailbox. BOILEAU then approached a window of the victim's house, yelled "hey!," whistled, and peered inside the residence. He then went around the back of the victim's house. BOILEAU walked through an unlocked gate at the back of the victim's house into the enclosed backyard and through the unlocked backdoor of the victim's house. The victim was not home at the time of the incident. The victim reported her belief that her residence had been properly secured prior to her departure.

11. L.C. saw BOILEAU then leave the victim's residence through the front door. According to L.C., BOILEAU told L.C. that BOILEAU saw U.S. Immigration documents in the victim's mail. L.C. again contacted the PCSO. PCSO deputies arrived at the scene at approximately 5:00 p.m. But before deputies could arrive, BOILEAU threatened L.C. BOILEAU stated that he was aware that it was L.C. who had contacted the police regarding the screws the day before and that BOILEAU was going to kill L.C. Then, using his hand, BOILEAU pointed and shot an imaginary gun at L.C. L.C. met with PCSO deputies and spoke with them about what he had witnessed that day and the day before (January 21 and 22).

12. Upon responding to L.C.'s call, PCSO deputies encountered BOILEAU walking north on Pinehurst Drive toward BOILEAU's own residence. They arrested

4

BOILEAU for burglary and placed him in the back of their police car. BOILEAU denied taking anything from the victim's residence or mailbox. PCSO deputies did not observe any damage to the residence. PCSO deputies noted on their report of January 22, 2019, that on or about January 21, 2019, BOILEAU also made similar statements such as "The US needs to rid the country of all of them" and that "We will get rid of them one way or another." Deputies had learned of those statements from L.C.

13. Following his arrest that evening, BOILEAU agreed to speak with PCSO deputies. Both before and after officers read BOILEAU his *Miranda* rights, BOILEAU uttered several disparaging remarks about the victim that related to her native region and nation of origin. BOILEAU made several statements that he disliked people of Middle Eastern descent. He also repeated his statement from the day before that the United States needs to rid the country of Middle Easterners, declaring that "we" will get rid of them one way or another. BOILEAU also stated that if he (referring to himself) doesn't get rid of them, "Trump will handle it." BOILEAU further referred to the victim and her family members as "habib."

14. On or about January 22, 2019, PCSO detectives conducted a post-arrest, post-*Miranda* interview with BOILEAU. BOILEAU stated that he had been remodeling his house approximately nine weeks ago and he was outside his yard working when an unidentified man was walking by and started talking to him. BOILEAU did not know the man's name but reported that he was a plumber. According to BOILEAU, the man looked at BOILEAU and pointed to the victim's

5

house, declaring: "ISIS lives there." After this conversation, BOILEAU took it upon himself to surveil the victim's house day and night because he was worried about ISIS being in the neighborhood. BOILEAU contacted the FBI to warn them about the victim's house, but BOILEAU felt that he was being ignored.

15. BOILEAU also recalled walking by the victim's house and tossing screws in their yard. He further stated that the reason he threw the screws onto the victim's property was to be a "pain in the ass" and to "get them to move." According to the interviewing officer, BOILEAU maintained a serious demeanor and reiterated that the victim was an ISIS terrorist. BOILEAU also reported hearing screams coming from the victim's house and believed the screams were a woman's screams because ISIS beats their women. He further expressed concern about the victim's curtains being open, taking it as a bad sign. He expressed his belief that, with the curtains opened, the victim and her family could see outside and thereby direct firearms to shoot him or police officers responding to the house to remove the victim's family.

16. BOILEAU admitted to walking into a neighbor's backyard so that he could see into the back of the victim's house. BOILEAU stated that when he did so, he noticed that the rear door was open and that the screen had a hole in it, which he also interpreted as troublesome because a rifle could be pointed through the screen. BOILEAU told the interviewing officer that he "needed to do something about it." He also stated that the victim and her family were present when he entered the backyard and that when they saw him, they all ran inside. Moreover, BOILEAU

6

reported that the victim's family had descended down from ladders before they ran inside. According to BOILEAU's account, he waited for everybody to leave the house and then went back over to the victim's house to confirm that they were gone so that he could look inside the house to see if "anything was going on." BOILEAU reportedly walked in all of the rooms of the victim's house to make sure that the house was free of ISIS and so that he could take pictures for the FBI. BOILEAU then reported walking out of the front door before L.C. confronted him. BOILEAU said that he and L.C. exchanged words and that L.C. had called PCSO.

17.   BOILEAU also admitted that he had received a shotgun from a neighbor. BOILEAU explained that he needed the shotgun for protection, and denied any intent to use it to go to the victim's house to harm anyone. He said that he needed the shotgun in case somebody came into his house to hurt him. BOILEAU added that he was aware of how ISIS worked.

18.   PCSO deputies requested and received verbal consent from BOILEAU to enter his residence to search for the shotgun. PCSO deputies entered BOILEAU'S residence and searched for the firearm. Inside, deputies recovered a Browning 12-gauge shotgun from BOILEAU's bed. Alongside the gun, deputies found a case of Federal Ammunition shotgun shells. Deputies took the gun and shells and returned them to their original owner.

19.   Following his arrest, BOILEAU was transported to the Pasco County Detention Center. On or about January 22, 2019, he telephoned his wife from jail and stated on a recorded call that he had been arrested for breaking and entering.

During his jail call, BOILEAU mentioned that he had been in contact with the FBI and further stated: "If you saw the house and you saw the shades and you saw the hole in the screen and you saw the guys uh..."[1] The phone call then cuts off.

20. On or about January 23, 2019, a longtime friend of BOILEAU, D.M., contacted the PCSO. D.M. reported that he lives next door to BOILEAU and that he has been friends with BOILEAU for the past 20 years. According to D.M., BOILEAU moved in next door to him in or about November 2018. D.M. expressed concern that BOILEAU may be mentally ill and further shared that BOILEAU had sent him text messages inquiring about borrowing a gun. D.M. also stated that by the time he had responded to BOILEAU, BOILEAU told him that he had already borrowed a shotgun from another friend.

21. On or about March 21, 2019, I interviewed D.V., the United States Postal Service mail carrier who delivers mail to BOILEAU's residence. According to D.V., BOILEAU approached D.V. sometime after the January 22 incident and proudly announced that he, BOILEAU, had reviewed the contents of the victim's mailbox. BOILEAU described, in detail, the mail located in the mailbox but denied taking any mail. BOILEAU stated that he had other people looking into the victim's family because he believed they were members of ISIS (apparently referring to the Islamic State in Iraq and Syria). Furthermore, BOILEAU told D.V. that he had a

---

[1] Database checks revealed that BOILEAU had contacted the FBI, specifically the FBI National Threat Operations Center (NTOC), on multiple occasions in January 2019. The FBI categorized his calls as having no value.

gun because BOILEAU believed he needed a gun to protect himself from the victim and that he needed to "take care of that family." When D.V. asked why, BOILEAU responded that the victim had a hole in her window screen and that he believed she was pointing a sniper rifle directly at BOILEAU'S house.

22. According to D.V., he told BOILEAU that D.V. would be reporting BOILEAU to his supervisor for tampering with government property. BOILEAU then became aggressive and began shouting at D.V., calling D.V. "fake news." According to D.V., in retaliation, BOILEAU has filed numerous complaints against D.V. with the U.S. Postal Service. On April 1, 2019, I spoke to D.V.'s supervisor, R.L. R.L. reported that he spoke with BOILEAU telephonically. BOILEAU was upset that D.V. accused BOILEAU of stealing something. BOILEAU did not elaborate as to what that "something" was. BOILEAU was upset and told R.L. that D.V. should deliver mail in a more Democratic neighborhood–not in BOILEAU's neighborhood. R.L. did not understand how this statement had anything to do with delivering mail.

23. On or about January 24, 2019, PCSO deputies interviewed BOILEAU'S wife. His wife, who lives in a different residence and is currently separated from BOILEAU, said that BOILEAU'S father died approximately three years ago and that BOILEAU has not recovered from his father's death. Furthermore, she conveyed her belief that BOILEAU was suffering from a mental illness, possibly bipolar disorder. PCSO deputies also collected text messages offered by BOILEAU's wife that she claimed BOILEAU had sent her. In the text messages,

BOILEAU reported that ISIS was in his neighborhood and claimed that ISIS had been spying on him.

24. On or about January 30, 2019, I interviewed the victim. She recalled that roughly ten days before the January 21 and 22 incidents, her family had experienced other suspicious activity around her house. One evening, at approximately 11:00 p.m., the victim had heard a loud sound and looked outside to see that her basketball hoop had been knocked over. She believed that someone might have attempted to take it off her property. Roughly 20 minutes later, she heard voices coming from outside her window. She turned on all the lights in her house to make it known that she was home. According to the victim, after hearing the noises, she and her neighbor, J.F., checked J.F.'s security camera footage. The security footage showed a person shining a flashlight into the victim's windows.

25. At the time of the interview, the victim and her children had been staying at her parents' house because they did not feel safe in their own house. Furthermore, the victim now drives her son to the school bus stop out of fear. Before the incidents, the victim's son used to walk to the bus stop, which required him to pass by BOILEAU's house.

26. On or about January 30, 2019, I also interviewed H.R., the victim's sister (also of Middle Eastern descent). H.R. lives in the same neighborhood as the victim and used to visit her on an almost daily basis, but is now afraid to visit the victim's house out of fear for her safety and that of her family.

27. H.R. stated that the day after the January 21 incident, the victim was terrified and extremely worried for her safety and that of her children. On or about January 22, 2019, H.R. and her husband were securing new surveillance cameras outside the victim's residence when H.R. observed BOILEAU standing in front of his house and pointing what H.R. perceived to be a cellphone at her. H.R. believed that BOILEAU was recording or taking photographs of her. She reported seeing light emanating from the phone but was not certain if it was the flashlight feature or the sun. H.R. believes that BOILEAU was attempting to intimidate her. H.R. reported feeling threatened by BOILEAU and was very scared. She immediately left the residence. H.R. is scared to drive by BOILEAU'S house, as she typically did to exit the neighborhood, and now avoids the street all together.

28. On or about February 7, 2019, PCSO deputies interviewed the victim's neighbors, R.D. and N.D., who reported that after BOILEAU was released from jail, and after the victim had secured a no-contact order against BOILEAU, they saw BOILEAU drive by the victim's residence on a motorcycle that they know BOILEAU to own. The motorcycle passed the victim's residence, slowed down right in front of the victim's house, and revved the engine loudly before driving away.[2]

29. On or about March 20, 2019, I interviewed neighbors N.D. and L.C., who told me that on March 18, 2019, they saw BOILEAU driving his truck to the home of R.M., whose house is located directly behind the victim's house. R.M.

---

[2] BOILEAU was interviewed regarding this incident and denied the allegation.

11

reported that he and BOILEAU are friends. L.C. also told PCSO deputies that on or about March 16, 2019, he saw BOILEAU taking R.M.'s dogs out. This conduct likely violates the victim's no-contact order because R.M.'s house is within 250 feet of the victim's house. R.M. stated that BOILEAU took the long route to his house to attempt to comply with the no-contact order. In taking the longer route, BOILEAU passed by J.R.'s house. J.R.'s house is also listed in the no-contact order, and thus violating said order.

30. On or about March 20, 2019, I also interviewed L.C. for a second time. According to L.C., BOILEAU created two signs and placed them on BOILEAU's property in retaliation for L.C. reporting BOILEAU's actions to law enforcement. I observed these signs. The first sign says "Sex Offender Pinehurst," with an arrow pointing in the direction of L.C.'s property. The second, smaller sign, also has an arrow pointing toward L.C.'s house with the street number 3358 written on top (this appears to be in error, as 3358 Pinehurst is further up the street in the opposite direction from the arrows. No one living at L.C.'s address is a registered sex offender). I also interviewed BOILEAU's neighbor, L.M., who said that she had recently told BOILEAU that a registered sex offender lived at L.C.'s address. She claimed that BOILEAU "ran with this information."

31. On or about March 20, 2019, I interviewed another person who lives in the victim's neighborhood, S.H. According to S.H., a person matching BOILEAU's description located at BOILEAU's house yells profanities at children when they walk by the house on their way to the bus stop. S.H. reported having heard a person who

matches BOILEAUS description yell: "there are dirty people that live in that house," pointing to the victim's house. S.H. also reported hearing that person state that he was going to clean the world of all the trash down there, pointing toward the victim's house.

32. On or about March 26, 2019, I interviewed the victim for a second time. The victim's friend and informal translator, Y.H., was also present for the interview. The victim and Y.H. reported that on or about March 18, 2019, they were standing outside the victim's house speaking to L.C.'s wife when they saw BOILEAU walking towards them. According to the victim and Y.H., BOILEAU was yelling "get the fuck out of my country!" and "get the fuck out of my neighborhood!" BOILEAU also had both his arms up and was using his arms to signal for the victim and Y.H. to come to BOILEAU. The victim and Y.H. immediately grabbed the victim's children, who were outside with them, and ran inside the victim's house. During this interview, the victim also reported that on another unknown date, the victim's sister, S.J., went to the victim's house to pick up the victim's children. According to the victim, two of her children (S.A. and L.A.), her sister S.J., and her sister's child, R.J., were driving by BOILEAU's house when S.J. reportedly saw BOILEAU point his fingers at his eyes and then point at the car in a manner consistent with someone who intends to communicate that they are watching the other person. The victim also reported yet another incident where the victim and her daughter, S.A., were driving by BOILEAU'S residence. (BOILEAU'S residence is located near one of the closest roads available to exit the victim's neighborhood from

the victim's house). BOILEAU was standing outside his house. The victim reported that she was primarily focused on driving, but noticed that BOILEAU, appearing agitated, was yelling at her and pointing toward another street. Although the victim did not hear the words that BOILEAU said, the victim's daughter, S.A., heard BOILEAU yelling "go on another street bitch!" The victim told me that she is terrified and extremely concerned about her and her family's safety. She reported that her children are scared—one daughter is afraid to go to the bathroom alone in their home and another daughter reported being scared that someone is looking in the windows.

33. On or about March 29, 2019, I interviewed another of the victim's neighbors, N.R. N.R. reported that approximately three or four weeks ago, N.R. was hosting a family gathering at her house. N.R.'s house is close to BOILEAU's house. Most of the guests were congregating in the driveway near the BBQ pit. A man matching BOILEAU's description showed up uninvited to the gathering. BOILEAU introduced himself as: "I'm Dave and I'm a racist." BOILEAU continued to speak about a family in the neighborhood whom BOILEAU believed to be terrorists. BOILEAU admitted that he had broken into the neighbor's house and observed evidence that they were terrorists. BOILEAU also said that he went through the contents of the neighbor's mailbox. N.R. reported yelling "you don't do stuff like that!" and told BOILEAU that he should allow the professionals to do their job. BOILEAU responded that the professionals were not doing their job. BOILEAU stated that he was going to go a national television program to out the neighbors as

terrorists and to put them on a watch list. BOILEAU further stated that "someone had to do it." BOILEAU declared his willingness to do so, adding that he was a Freedom Fighter. BOILEAU was eventually asked to leave the gathering when he began to, without consent, touch a woman's head. On his way out, BOILEAU yelled: "Fuck the neighbors and fuck the neighborhood!" BOILEAU kicked N.R.'s mailbox on his way out.

## CONCLUSION

34. Based on the foregoing facts, there is probable cause to believe that DAVID ALLEN BOILEAU interfered with the victim's housing rights because of her religion and national origin, in violation of 42 U.S.C. § 3631 (Criminal Interference with Right to Fair Housing). There is also probable cause to believe that BOILEAU tampered with a witness, that is, L.C., by threatening to kill him, in violation of 18 U.S.C. § 1512(a)(2)(C) (Tampering With a Witness, Victim, or Informant by Physical Force or Threat Communication).

_____
SUSANA MAPU
Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me
this 19th day of April, 2019.

_____
AMANDA A. SANSONE
United States Magistrate Judge

16